01

02

03

04

05                          UNITED STATES DISTRICT COURT
                       FOR THE EASTERN DISTRICT OF CALIFORNIA
06

07   ROBERT MCCOY,                          )
                                            )
08          Petitioner,                     )   CASE NO. 2:07-cv-00642-RSL-JLW
                                            )
09          v.                              )
                                            )
10   D.K. SISTO, Warden,                    )   REPORT AND RECOMMENDATION
                                            )
11          Respondent.                     )
     _____    )
12

13          I.      SUMMARY

14          Petitioner Robert McCoy is currently incarcerated at the California State Prison,

15   Solano in Vacaville, California.  He was convicted by a jury of second degree murder with a

16   firearm enhancement in San Mateo County Superior Court on January 7, 1993, and sentenced

17   to 16-years-to-life with the possibility of parole.  He has filed a petition for writ of habeas

18   corpus under 28 U.S.C. § 2254 challenging his 2005 denial of parole by the Board of Parole

19   Hearings of the State of California (the "Board").[1]  (*See* Docket 1, Exhibits A-L.)  Respondent

20   has filed an answer to the petition, together with relevant portions of the state court record,

21   and petitioner has filed a traverse in reply to the answer.  (*See* Dkt. 6; Dkt. 7.)  The briefing is

22   now complete and this matter is ripe for review.  The Court, having thoroughly reviewed the

---

[1] The Board of Parole Hearings replaced the Board of Prison Terms, which was abolished on July 1, 2005.  *See* California Penal Code § 5075(a).

REPORT AND RECOMMENDATION - 1

01 record and briefing of the parties, recommends the Court deny the petition, and dismiss this

02 action with prejudice.

03     II.   BACKGROUND

04        On June 14, 1991, petitioner engaged in a verbal dispute with the victim over a five-

05 dollar debt.  (*See* Dkt. 1, Ex. H at 1.)  Petitioner took a swing at the victim with his fist, but

06 missed.  In response, the victim punched petitioner, knocking him to the ground.  (*See id*. at 1-

07 2.)  Two bystanders broke up the fight, and petitioner told the victim, "I'll be back to fix you

08 up real good."  (*Id*. at 2.)  He went home and retrieved a 12-inch knife from the kitchen, and

09 hid it in the front of his pants.  (*See id*.)  While at home, he also told his 16-year old grandson

10 that he was going "looking for Blue," which was the victim's street name.  (*Id*.)  McCoy

11 returned to the victim, who was still standing on the street.  (*Id*.)  Despite efforts by his

12 grandson to stop him, petitioner walked up to the victim and said, "I am going to stab you."

13 (*Id*.)  Petitioner drew his knife and swung it at the victim, and when the victim attempted to

14 retreat, petitioner chased him.  (*See id*.)  The victim picked up a stick and swung it at

15 petitioner, breaking it on petitioner's face and hand, but petitioner simultaneously stabbed him

16 in the chest.  (*See id*.)  The victim attempted to flee once more, but staggered and fell face-

17 first on the sidewalk.  (*See id*. at 2-3.)  As the victim fell, petitioner yelled, "I got you now and

18 I'm going to kill you."  (*Id*. at 3.)  Petitioner then jumped on the victim's back and stabbed him

19 ten times, killing him.  (*See id*., Ex. A at 3.)  When police located petitioner near his house

20 shortly after the murder, petitioner told them, "I'm the guy you want."  (*See id*., Ex. H at 3.)

21 Both petitioner and the victim had been drinking prior to the fight, and had high blood alcohol

22 levels.  (*See id*., Ex. A at 3.)

REPORT AND RECOMMENDATION - 2

01        The commitment offense occurred in 1991, when petitioner was fifty-one-years-old.

02   Petitioner was originally convicted by a jury of second degree murder with a prior murder

03   conviction and weapons enhancement, and sentenced to life without the possibility of parole.

04   (*See* Dkt. 1, Ex. A at 1; Dkt. 6, Ex. 2 at 1.)  In the sanity phase of petitioner's 1993 murder

05   trial, the jury heard testimony regarding a prior head injury suffered by petitioner during an

06   automobile accident.  (*See* Dkt. 1 at 5-4.)  Despite petitioner's injury, the jury found that

07   petitioner was sane at the time of the instant offense.  (*See id*.)

08        Petitioner also had an earlier, entirely separate conviction for murder, following a trial

09   in 1972.  (*See id*.)  In a federal habeas challenge to his 1993 murder conviction, petitioner

10   claimed that his trial counsel in his 1972 murder trial was ineffective because he failed to

11   inform him of the viability of a diminished capacity defense before he entered a guilty plea.

12   (*See id*. at 5-5.)  Petitioner argued that his 1972 murder conviction was therefore improperly

13   used to enhance his sentence in his 1993 murder conviction.  (*See id*.)  The U.S. District Court

14   for the Northern District of California granted his habeas petition, and the United States Court

15   of Appeals for the Ninth Circuit affirmed.  *See McCoy v. Hubbard*, 232 F.3d 895, 2000 WL

16   1023208, at *2 (9th Cir. 2000) (unpublished disposition).  (*See also* Dkt. 6, Ex. 3 at 1-2.)

17   Accordingly, petitioner was resentenced for his 1993 murder conviction to 16-years-to-life

18   with the possibility of parole for second degree murder with a firearm enhancement.  (*See id*.,

19   Ex. 1 at 1-2; Dkt. 1, Ex. H at 1.)  His minimum eligible parole date was set for February 13,

20   2002.  (*See* Dkt. 1, Ex. H at 1.)

21        The parole denial which is the subject of this petition took place after a parole hearing

22   held on December 5, 2005.  (*See id*.)  This was petitioner's first subsequent parole

     consideration hearing, as his initial application for parole in 2001 was denied for four years.

REPORT AND RECOMMENDATION - 3

01   (*See id*., Ex. F at 1.)  As of the date of the 2005 parole hearing, petitioner was sixty-five-

02   years-old, and had been in custody for approximately twelve years.

03         After denial of his 2005 application, petitioner filed habeas corpus petitions in the San

04   Mateo County Superior Court, California Court of Appeal, and California Supreme Court.

05   (*See id*., Exs. I; Dkt. 6, Exs. 8 and 10.)  Those petitions were unsuccessful.  (*See* Dkt. 1, Exs.

06   I, K, and L.)  This federal habeas petition followed.  Petitioner contends his 2005 denial by

07   the Board violated his Fifth and Fourteenth Amendment Due Process rights.  Thus, petitioner

08   does not challenge the validity of his conviction, but instead challenges the Board's 2005

09   decision finding him unsuitable for parole.

10         III.     STANDARD OF REVIEW

11         The Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA") governs this

12   petition because it was filed after the enactment of AEDPA.  *See Lindh v. Murphy*, 521 U.S.

13   320, 326-27 (1997).  Because petitioner is in custody of the California Department of

14   Corrections pursuant to a state court judgment, 28 U.S.C. § 2254 provides the exclusive

15   vehicle for his habeas petition.  *See White v. Lambert*, 370 F.3d 1002, 1009-10 (9th Cir.), *cert.*

16   *denied*, 543 U.S. 991 (2004) (providing that § 2254 is "the exclusive vehicle for a habeas

17   petition by a state prisoner in custody pursuant to a state court judgment, even when the

18   petitioner is not challenging his underlying state court conviction.").  Under AEDPA, a

19   habeas petition may not be granted with respect to any claim adjudicated on the merits in state

20   court unless petitioner demonstrates that the highest state court decision rejecting his petition

21   was either "contrary to, or involved an unreasonable application of, clearly established

22   Federal law, as determined by the Supreme Court of the United States," or "was based on an

    unreasonable determination of the facts in light of the evidence presented in the State court

REPORT AND RECOMMENDATION - 4

01   proceeding."  28 U.S.C. § 2254(d)(1) and (2).

02          As a threshold matter, this Court must ascertain whether relevant federal law was

03   "clearly established" at the time of the state court's decision.  To make this determination, the

04   Court may only consider the holdings, as opposed to dicta, of the United States Supreme

05   Court.  *See Williams v. Taylor*, 529 U.S. 362, 412 (2000).  In this context, Ninth Circuit

06   precedent remains persuasive but not binding authority.  *See id.* at 412-13; *Clark v. Murphy*,

07    331 F.3d 1062, 1069 (9th Cir. 2003).

08          The Court must then determine whether the state court's decision was "contrary to, or

09   involved an unreasonable application of, clearly established Federal law."  *See Lockyer v.*

10   *Andrade*, 538 U.S. 63, 71 (2003).  "Under the 'contrary to' clause, a federal habeas court may

11   grant the writ if the state court arrives at a conclusion opposite to that reached by [the

12   Supreme] Court on a question of law or if the state court decides a case differently than [the]

13   Court has on a set of materially indistinguishable facts."  *Williams*, 529 U.S. at 412-13.

14   "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the

15   state court identifies the correct governing legal principle from [the] Court's decisions but

16   unreasonably applies that principle to the facts of the prisoner's case."  *Id.* at 413.  At all

17   times, a federal habeas court must keep in mind that it "may not issue the writ simply because

18   [it] concludes in its independent judgment that the relevant state-court decision applied clearly

19   established federal law erroneously or incorrectly.  Rather that application must also be

20   [objectively] unreasonable."  *Id.* at 411.

21          In each case, the petitioner has the burden of establishing that the state court decision

22   was contrary to, or involved an unreasonable application of, clearly established federal law.

     *See* 28 U.S.C. § 2254; *Baylor v. Estelle*, 94 F.3d 1321, 1325 (9th Cir. 1996).  To determine

REPORT AND RECOMMENDATION - 5

01   whether the petitioner has met this burden, a federal habeas court looks to the last reasoned

02   state court decision because subsequent unexplained orders upholding that judgment are

03   presumed to rest upon the same ground.  *See Ylst v. Nunnemaker*, 501 U.S. 797, 803-04

04   (1991); *Medley v. Runnels*, 506 F.3d 857, 862 (9th Cir. 2007).

05        Finally, AEDPA requires federal courts to give considerable deference to state court

06   decisions, and state courts' factual findings are presumed correct.  *See* 28 U.S.C. § 2254(e)(1).

07   Federal courts are also bound by a state's interpretation of its own laws.  *See Murtishaw v.*

08   *Woodford*, 255 F.3d 926, 964 (9th Cir. 2001) (citing *Powell v. Ducharme,* 998 F.2d 710, 713

09   (9th Cir. 1993)).

10        IV.     FEDERAL HABEAS CHALLENGES TO STATE PAROLE DENIALS

11        A.     *Due Process Right to be Released on Parole*

12        Under the Fifth and Fourteenth Amendments to the United States Constitution, the

13   government is prohibited from depriving an inmate of life, liberty or property without the due

14   process of law.  U.S. Const. amends. V, XIV.  A prisoner's due process claim must be

15   analyzed in two steps: the first asks whether the state has interfered with a constitutionally

16   protected liberty or property interest of the prisoner, and the second asks whether the

17   procedures accompanying that interference were constitutionally sufficient.  *Ky. Dep't of*

18   *Corrs. v. Thompson*, 490 U.S. 454, 460 (1989); *Sass v. Cal. Bd. of Prison Terms*, 461 F.3d

19   1123, 1127 (9th Cir. 2006).

20        Accordingly, our first inquiry is whether petitioner has a constitutionally protected

21   liberty interest in parole.  The Supreme Court articulated the governing rule in this area in

22   *Greenholtz v. Inmates of Neb. Penal,* 442 U.S. 1 (1979), and *Board of Pardons v. Allen,* 482

     U.S. 369 (1987).  *See McQuillion v. Duncan*, 306 F.3d 895, 902 (9th Cir. 2002) (applying

REPORT AND RECOMMENDATION - 6

01 "the 'clearly established' framework of *Greenholtz* and *Allen*" to California's parole scheme).

02 The Court in *Greenholtz* determined that although there is no constitutional right to be

03 conditionally released on parole, if a state's statutory scheme employs mandatory language

04 that creates a presumption that parole release will be granted if certain designated findings are

05 made, the statute gives rise to a constitutional liberty interest. *See Greenholtz*, 442 U.S. at 7,

06 12; *Allen*, 482 U.S. at 377-78.

07          As discussed *infra*, California statutes and regulations afford a prisoner serving an

08 indeterminate life sentence an expectation of parole unless, in the judgment of the parole

09 authority, he "will pose an unreasonable risk of danger to society if released from prison."

10 Title 15 Cal. Code Regs., § 2402(a). The Ninth Circuit has therefore held that "California's

11 parole scheme gives rise to a cognizable liberty interest in release on parole." *McQuillion*,

12 306 F.3d at 902. To similar effect, *Irons v. Carey*, 505 F.3d 846, 850 (9th Cir. 2007) held

13 that California Penal Code § 3041 vests all "prisoners whose sentences provide for the

14 possibility of parole with a constitutionally protected liberty interest in the receipt of a parole

15 release date, a liberty interest that is protected by the procedural safeguards of the Due

16 Process Clause." This "liberty interest is created, not upon the grant of a parole date, but

17 upon the incarceration of the inmate." *Biggs v. Terhune*, 334 F.3d 910, 915 (2003). *See also*

18 *Sass*, 461 F.3d at 1127.

19          Because the Board's denial of parole interfered with petitioner's constitutionally-

20 protected liberty interest, this Court must proceed to the second step in the procedural due

21 process analysis and determine whether the procedures accompanying that interference were

22 constitutionally sufficient. "[T]he Supreme Court [has] clearly established that a parole

board's decision deprives a prisoner of due process with respect to this interest if the board's

REPORT AND RECOMMENDATION - 7

01  decision is not supported by 'some evidence in the record.'" *Irons*, 505 F.3d at 851 (citing

02  *Superintendent v. Hill*, 472 U.S. 445, 457 (1985) (holding the "some evidence" standard

03  applies in prison disciplinary proceedings)).  The "some evidence" standard requires this

04  Court to determine "whether there is any evidence in the record that could support the

05  conclusion reached by the disciplinary board."  *Hill*, 472 U.S. at 455-56.  Although *Hill*

06  involved the accumulation of good time credits rather than release on parole, later cases have

07  held that the same constitutional principles apply in the parole context because both situations

08  directly affect the duration of the prison term.  *See e.g., Jancsek v. Or. Bd. of Parole*, 833 F.2d

09  1389, 1390 (9th Cir. 1987) (adopting the "some evidence" standard set forth by the Supreme

10  Court in *Hill* in the parole context); *accord, Sass*, 461 F.3d at 1128-29); *Biggs*, 334 F.3d at

11  915; *McQuillion*, 306 F.3d at 904.

12      "The fundamental fairness guaranteed by the Due Process Clause does not require

13  courts to set aside decisions of prison administrators that have some basis in fact," however.

14  *Hill*, 472 U.S. at 456.  Similarly, the "some evidence" standard is not an invitation to examine

15  the entire record, independently assess witnesses' credibility, or re-weigh the evidence.  *Id.* at

16  455.  Instead, it is there to ensure that an inmate's loss of parole was not arbitrarily imposed.

17  *See id.* at 454.  The Court in *Hill* added an exclamation point to the limited scope of federal

18  habeas review when it upheld the finding of the prison administrators despite the Court's

19  characterization of the supporting evidence as "meager."  *See id.* at 457.

20      B.      *California's Statutory and Regulatory Scheme*

21      In order to determine whether "some evidence" supported the Board's decision with

22  respect to petitioner, this Court must consider the California statutes and regulations that

govern the Board's decision-making.  *See Biggs*, 334 F.3d at 915.  Under California law, the

REPORT AND RECOMMENDATION - 8

01  Board is authorized to set release dates and grant parole for inmates with indeterminate

02  sentences.  *See* Cal. Penal Code § 3040 and 5075, *et seq.*  Section 3041(a) requires the Board

03  to meet with each inmate one year before the expiration of his minimum sentence and

04  normally set a release date in a manner that will provide uniform terms for offenses of similar

05  gravity and magnitude with respect to their threat to the public, as well as comply with

06  applicable sentencing rules.  Subsection (b) of this section requires that the Board set a release

07  date "unless it determines that the gravity of current convicted offense or offenses, or the

08  timing and gravity of current or past convicted offense or offenses, is such that consideration

09  of the public safety requires a more lengthy period of incarceration." *Id.*, § 3041(b).  Pursuant

10  to the mandate of § 3041(a), the Board must "establish criteria for the setting of parole release

11  dates" which take into account the number of victims of the offense as well as other factors in

12  mitigation or aggravation of the crime.  The Board has therefore promulgated regulations

13  setting forth the guidelines it must follow when determining parole suitability.  *See* 15 CCR

14  § 2402, *et seq.*

15       Accordingly, the Board is guided by the following regulations in making a

16  determination whether a prisoner is suitable for parole:

17       (a) General. The panel shall first determine whether the life prisoner is suitable
        for release on parole. Regardless of the length of time served, a life prisoner
18      shall be found unsuitable for and denied parole if in the judgment of the panel
        the prisoner will pose an unreasonable risk of danger to society if released
19      from prison.

20       (b) Information Considered. All relevant, reliable information available to the
        panel shall be considered in determining suitability for parole. Such
21      information shall include the circumstances of the prisoner's social history;
        past and present mental state; past criminal history, including involvement in
22      other criminal misconduct which is reliably documented; the base and other
        commitment offenses, including behavior before, during and after the crime;
        past and present attitude toward the crime; any conditions of treatment or

REPORT AND RECOMMENDATION - 9

01    control, including the use of special conditions under which the prisoner may
      safely be released to the community; and any other information which bears on
02    the prisoner's suitability for release. Circumstances which taken alone
      may not firmly establish unsuitability for parole may contribute to a pattern
03    which results in a finding of unsuitability.

04   15 CCR § 2402(a) and (b).  Subsections (c) and (d) also set forth suitability and unsuitability

05   factors to further assist the Board in analyzing whether an inmate should be granted parole,

06   although "the importance attached to any circumstance or combination of circumstances in a

07   particular case is left to the judgment of the panel." 15 CCR § 2402(c).

08          In examining its own statutory and regulatory framework, the California Supreme

09   Court in *In re Lawrence* recently held that the proper inquiry for a reviewing court is

10   "whether some evidence supports the *decision* of the Board … that the inmate constitutes a

11   current threat to public safety, and not merely whether some evidence confirms the existence

12   of certain factual findings."  *In re Lawrence*, 44 Cal.4th 1181, 1212 (2008).  The court also

13   asserted that the Board's decision must demonstrate "an individualized consideration of the

14   specified criteria, but "[i]t is not the existence or nonexistence of suitability or unsuitability

15   factors that forms the crux of the parole decision; the significant circumstance is how those

16   factors interrelate to support a conclusion of current dangerousness to the public."  *Id*. at

17   1204-05, 1212.  As long as the evidence underlying the Board's decision has "some indicia of

18   reliability," parole has not been arbitrarily denied.  *See Jancsek*, 833 F.2d at 1390.  As the

19   California courts have continually noted, the Board's discretion in parole release matters is

20   very broad.  *See Lawrence*, 44 Cal.4th at 1204.  Thus, the penal code, corresponding

21   regulations, and California law clearly establish that the fundamental consideration in parole

22   decisions is public safety and an assessment of a prisoner's current dangerousness.  *See id.*, at

     1205-06.

REPORT AND RECOMMENDATION - 10

01          C.      *Summary of Governing Principles*

02          By virtue of California law, petitioner has a constitutional liberty interest in release on

03   parole.  The parole authorities may decline to set a parole date only upon a finding that

04   petitioner's release would present an unreasonable present risk of danger to society if he is

05   released from prison.  Where the parole authorities deny release, based upon an adverse

06   finding on that issue, the role of a federal habeas court is narrowly limited.  It must deny relief

07   if there is "some evidence" in the record to support the parole authority's finding of present

08   dangerousness.  The penal code, corresponding regulations, and California law clearly support

09   the foregoing interpretation.

10          V.      PARTIES' CONTENTIONS

11          Petitioner contends that the Board violated his state and federal due process rights by

12   finding him unsuitable for parole without any evidence that he poses an unreasonable risk of

13   danger to society if released from prison.[2]  (*See* Dkt. 1, at 3-4.)  Specifically, petitioner claims

14   that the Board found him unsuitable based upon the immutable facts of the commitment

15   offense.  (*See id*. at 8-9 and 17-19.)  In addition, petitioner contends that the Board failed to

16   afford him an individualized consideration of all relevant suitability factors, such as the use of

17   special conditions of parole under which petitioner could be safely released into the

18   community.  (*See id*. at 22-25.)  Finally, petitioner argues that the Board violated his due

19   process rights by holding his 2005 parole hearing six months late, in violation of the

20   statutorily prescribed time limits set forth in California Penal Code § 3041.5.  (*See id*. at 2 and

21   25-29.)

22   _____

          [2] We do not reach petitioner's claim that his state due process rights were violated, as state claims are
     not cognizable in a federal habeas petition. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (asserting that "it
     is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.").

01       Respondent claims that petitioner does not have a constitutionally protected liberty

02   interest in being released on parole, that the "some evidence" standard is inapplicable in this

03   context, and that even if he does have a protected liberty interest, the Board adequately

04   predicated its denial of parole on "some evidence."  (*See* Dkt. 6 at 4-5 and 8-14.)  In addition,

05   respondent argues that petitioner's claims regarding the Board's failure to consider special

06   conditions of parole or hold petitioner's 2005 parole hearing in a timely manner are based

07   upon state law, and are therefore not cognizable in federal habeas corpus proceedings.  (*See*

08   *id*. at 14.)  Respondent contends that petitioner's untimely parole hearing claim is also moot,

09   because the Board conducted petitioner's parole hearing on December 5, 2005.  (*See id*. at 14-

10   15.)  Accordingly, respondent asserts that petitioner's due process rights were not violated by

11   the Board's 2005 decision, and the San Mateo County Superior Court's Order upholding the

12   Board's 2005 parole denial was not an unreasonable application of clearly established federal

13   law.  (*See id*. at 7, and 15.)

14       VI.    ANALYSIS OF RECORD IN THIS CASE

15       A.    *Commitment Offense*

16       The Board based its decision that petitioner was unsuitable for parole primarily upon

17   his commitment offense, as well as petitioner's record of previous violence, failure to profit

18   from society's previous attempts to correct his criminality, unstable social history, insufficient

19   participation in self-help programming, failure to demonstrate adequate insight regarding the

20   commitment offense, unfavorable 2001 mental health evaluation, failure to upgrade

21   vocationally or develop marketable skills, and insufficient documentation of viable parole

22   plans.  (*See* Dkt. 1, Ex. H at 37-39.)  The Board's findings track the applicable unsuitability

and suitability factors listed in § 2402(b), (c) and (d) of Chapter 15 of the California Code of

01 Regulations.  After considering all reliable evidence in the record, the Board concluded that

02 evidence of petitioner's positive behavior in prison did not outweigh evidence of his

03 unsuitability for parole.  (*See* Dkt. 1, Ex. I at 37.)

04      With regard to the circumstances of the commitment offense, the Board concluded that

05 the offense was carried out in an especially heinous, atrocious, or cruel manner.  (*See id*. at

06 37.)  *See also* 15 CCR § 2402(c)(1).  Petitioner had initiated the physical dispute with the

07 victim, and when their fight was broken-up by bystanders, he threatened the victim with

08 violence.  (*See* Dkt. 1, Ex. H at 1-2.)  Petitioner went home and retrieved a 12-inch knife from

09 his kitchen, and after ignoring his grandson's efforts to stop him, returned to the victim and

10 swung the knife at him.  (*Id.* at 2.)  When the victim attempted to run away, petitioner chased

11 him, and eventually overcame the victim's efforts to defend himself with a stick by stabbing

12 the victim in the chest.  (*Id.*)  When the victim fell face-first on the sidewalk, petitioner

13 jumped on the victim's back and stabbed him ten times, killing him.  (*See id.*, Ex. A at 3; Ex.

14 H at 2-3.)

15      Based upon these facts, the Board found that the offense was carried out in an

16 especially cruel and callous manner, because the petitioner "had a clear opportunity to stop,

17 but [he] continued" to violently attack the victim.  (*See* Dkt. 1, Ex. H at 37.)  The Board

18 concluded that the motive for the crime was inexplicable or very trivial in relation to the

19 offense, because the dispute involved a five-dollar debt.  (*See id.*)  *See also* 15 CCR

20 § 2402(c)(1)(E).  The Board also originally found that the victim was mutilated by petitioner,

21 and that the offense was carried out in a dispassionate and calculated manner as well as a

22 manner which demonstrates an exceptionally callous disregard for human suffering, because

the petitioner used "two weapons, a stick and a knife," to murder the victim.  (*See* Dkt. 1,

REPORT AND RECOMMENDATION - 13

01  Ex. H at 37.)  Petitioner objected to the panel's characterization of the facts during the

02  decision and asserted that the victim had used the stick, and the Deputy District Attorney

03  agreed.  (*See id*. at 37, 39-40, and 42-43.)  The panel admitted their mistake, and reaffirmed

04  their finding that the victim had been mutilated by petitioner, because "[t]he victim was

05  stabbed multiple times."  (*See id*. at 43.)  *See also* 15 CCR § 2402(c)(1)(C).  Although the

06  Board did not also expressly reaffirm its findings that the offense was carried out in a

07  dispassionate and calculated manner or a manner demonstrating an exceptionally callous

08  disregard for human suffering, the circumstances surrounding the commitment offense,

09  including petitioner's mutilation of the victim and his trivial motive, provide "some evidence"

10  to support the Board's finding that the murder was carried out in an especially heinous,

11  atrocious, or cruel manner.  *See* 15 CCR § 2402(c)(1)(B) – (E).

12          The second and third factors relied upon by the Board were petitioner's previous

13  record of violence and failure to profit from society's prior attempts to correct his criminality.

14  (*See* Dkt. 1, Ex. H at 38.)  *See also* 15 CCR § 2402(b) and (c)(2).  The Board found that "on

15  many previous occasions, [petitioner] inflicted or attempted to inflict serious injury on

16  victims, including a prior murder attempt, multiple ADW's, attack with deadly weapons, plus

17  spousal abuse situations."  (*See* Dkt. 1, Ex. H at 38.)  The Board asserted that petitioner's

18  record of violence and assaultive behavior "has continued unabated over 19 years,

19  culminating in the instant crime committed when [he was] a 51-year old adult."  (*Id*.)

20  Petitioner also failed to profit from society's previous attempts to correct his criminality, such

21  as prior grants of adult probation and parole.  (*See id*.)  Furthermore, the Board noted that

22  petitioner "put a 16-year-old at risk in conducting this crime, and then at least in part, blamed

the juvenile for that" during his initial parole hearing.  (*Id*. at 29, and 40.)  Petitioner's

REPORT AND RECOMMENDATION - 14

01  extensive history of violence and failure to learn from society's previous attempts to correct

02  his criminality, such as grants of adult probation and parole, provide "some evidence" to

03  support the Board's findings.

04      The fourth factor relied upon by the Board was petitioner's unstable social history.

05  (*See id.*, Ex. H at 38.)  *See also* 15 CCR § 2402(c)(3).  Specifically, the Board found that

06  petitioner has "a history of unstable and tumultuous relationships with others, including

07  spousal corporal injuries." (*See* Dkt. 1, Ex. H at 38.)  During the hearing, the Board noted that

08  petitioner had two prior marriages, both of which involved domestic violence and ended in

09  separation.  (*See id.* at 16.)  Petitioner was also incarcerated in 1985 for assaulting his second

10  wife.  (*See id.*, Ex. E at 2.)  When the second marriage ended, petitioner's children were

11  placed in foster care due to his commitment to the CDC.  (*See id.*)  Based upon these facts,

12  there was clearly "some evidence" in the record to support the Board's finding that petitioner

13  has a history of unstable or tumultuous relationships with others.

14      The fifth, sixth, and seventh factors relied upon by the Board were petitioner's failure

15  to demonstrate adequate insight regarding the commitment offense, unfavorable 2001 mental

16  health evaluation, and insufficient participation in self-help programming.  (*See id.*, Ex. H at

17  38.)  The Board is required to consider a petitioner's "past and present attitude toward the

18  crime."  *See* 15 CCR § 2402(b).  When asked about his past alcohol use, petitioner responded,

19  "drinks – I knew that might have been the trigger.  But if I hadn't ran out of cigarettes and

20  gone – and left home and go get them, I believe I'd still been home … I wasn't thinking

21  rationally, and I was (indiscernible) because of the alcohol.  I was in no position to defend

22  myself or think clearly."  *(See* Dkt. 1, Ex. H at 27.)  He stated that "[a]lcohol, every time I

    think about it, it scares me.  I never been so close to reality and so close to dying in my life

01  and alcohol was the cause of it." (*Id*. at 26.)

02      In addition, the Board noted that the most recent psychological report, which was

03  prepared in 2001, was very unfavorable.  Specifically, the psychologist diagnosed petitioner

04  as suffering from anti-social personality disorder, and assessed petitioner's "prognosis for

05  successful community living [as] lower than average.  (*See id*. at 38-39; *id*., Ex. E at 3-4.)

06  The psychologist stated that "whether or not [petitioner's] injury has any bearing on his

07  violent behavior, he … [is] an individual with a low tolerance for stress and frustration, and

08  very lacking in impulse control.  If not in a controlled setting, [petitioner] has an extremely

09  high potential for involvement in future violent behavior." (*See id*., Ex. E at 3.)  The Board

10  also relied upon the psychologist's observation that petitioner "presents a somewhat

11  superficial naïve attitude about returning to society," and shows "only limited insight into

12  what had happened during the crime regarding his own behavior." (*See id*., Ex. H at 39; *id*.,

13  Ex. E at 5.)   Furthermore, the Board found that petitioner had not participated in any self-help

14  or therapy programs in prison as of the date of the hearing.  (*See id*., Ex. H at 22 and 38.)

15  Thus, the record provides "some evidence" to support the Board's findings regarding

16  petitioner's failure to demonstrate adequate insight regarding the commitment offense,

17  unfavorable 2001 mental health evaluation, and insufficient participation in self-help or

18  therapy programs in prison.

19      Finally, the Board noted petitioner's failure to sufficiently upgrade vocationally or

20  develop marketable skills, as well as his insufficient documentation of viable parole plans.

21  *See* 15 CCR § 2402(d)(8).  The Board asserted that petitioner has programmed in a limited

22  manner while incarcerated, and although petitioner worked "on and off" as a painter and truck

    driver prior to his imprisonment, it questioned whether this employment history constituted

REPORT AND RECOMMENDATION - 16

01 | marketable skills.  (*See* Dkt. 1, Ex. H at 19 and 38.)  The Board also found that petitioner has

02 | failed to sufficiently upgrade vocationally in prison, because he told the panel during the

03 | hearing that he was "just beginning to … get the feel" of vocational painting.  (*See id*. at 20.)

04 | In addition, the Board found that petitioner lacked realistic parole plans, such as acceptable

05 | employment plans and viable residential plans in the last county of his legal residence.  (*See*

06 | *id*. at 17-18 and 38-39.)  Accordingly, there was "some evidence" to support the Board's

07 | findings that petitioner failed to develop marketable skills, upgrade vocationally, or arrange

08 | viable parole plans.

09 | Contrary to petitioner's argument that the Board failed to consider or give appropriate

10 | weight to the parole suitability rules which favored petitioner, the Board acknowledged that

11 | petitioner has a very favorable disciplinary record in prison.  (*See id*. at 38.)  *See also* 15 CCR

12 | § 2402(d)(9) ("Institutional activities indicate an enhanced ability to function within the law

13 | upon release.").  Specifically, the Board cited petitioner's "two minor 128s," and commended

14 | him "for serving for many years with discipline-free behavior."  (*See* Dkt. 1, Ex. H at 38.)  It

15 | is therefore an inaccurate characterization of the record to say that the Board failed to consider

16 | evidence that favored petitioner, or found him unsuitable for parole based solely upon the

17 | commitment offense.  (*See* Dkt. 1 at 8-9 and 17-19.)  Despite petitioner's good behavior in

18 | prison, the Board determined that his commitment offense, record of previous violence,

19 | failure to profit from society's previous attempts to correct his criminality, unstable social

20 | history, insufficient participation in self-help programming, failure to demonstrate adequate

21 | insight regarding the commitment offense, unfavorable 2001 mental health evaluation, failure

22 | to upgrade vocationally or develop marketable skills, and insufficient parole plans, indicate

that he remains an unreasonable risk of danger to society if released on parole.  (*See id*., Ex. H

01 | at 37-39.)

02 |        B.     *Special Conditions of Parole*

03 |       As stated above, it is beyond the authority of a federal habeas court to determine

04 | whether evidence of suitability outweighs the circumstances of the commitment offense,

05 | together with any other reliable evidence of unsuitability for parole.  Petitioner contends that

06 | the Board failed to provide "an individualized consideration of the specified criteria" by

07 | failing to discuss the possibility of using special conditions of parole to safely release

08 | petitioner into the community.  (*See* Dkt. 1 at 22-25.)  Under the governing regulations,

09 | however, the Board's failure to discuss this issue on the record was permissible because the

10 | Board has broad discretion to determine how suitability and unsuitability factors interrelate to

11 | support its conclusion of current dangerousness to the public.  *See Lawrence*, 44 Cal.4th at

12 | 1212; 15 CCR § 2402(b) ("All relevant, reliable information available to the panel shall be

13 | considered in determining suitability for parole.  Such information shall include ... any

14 | conditions of treatment or control, including the use of special conditions under which the

15 | prisoner may safely be released to the community.").  Due process protections of the U.S.

16 | Constitution do not require the Board to discuss special conditions of parole where the Board

17 | has concluded that petitioner would pose an unreasonable risk of danger to society if released,

18 | and to hold otherwise is to put the proverbial cart before the horse.  Thus, the Board's findings

19 | with respect to petitioner were based upon an "individualized consideration of the specified

20 | criteria," and were amply supported by evidence in the record.  *See Lawrence*, 44 Cal.4th at

21 | 1212.

22 |

01          C.      *Postponement of Parole Hearing*

02          Petitioner also contends that his due process rights were violated because his 2005

03   parole hearing was held approximately six months late, in violation of the statutorily

04   prescribed time limits set forth in California Penal Code § 3041.5.  (*See* Dkt. 1 at 2 and 25-

05   29.)  As discussed *supra*, Supreme Court precedent has established only two requirements for

06   due process in the parole context: (1) the inmate must receive an opportunity to be heard and a

07   decision explaining the reasons for the parole denial, *see Greenholtz*, 442 U.S. at 16, and (2)

08   the decision must be supported by "some evidence," *see Hill*, 472 U.S. at 455-57; *Irons*, 505

09   F.3d at 851.  Petitioner received an opportunity to be heard at his parole hearing held on

10   December 5, 2005, as well as a decision explaining the reasons for the denial that was

11   supported by "some evidence."  (*See* Dkt. 1, Ex. H at 37-43.)  Because the Due Process

12   Clause does not require more, such as adherence to statutory time limits set forth by state law,

13   the postponement of petitioner's 2005 parole hearing for six months did not violate his due

14   process rights.  *See Garvin v. Sisto*, No. 2:06-cv-02266, 2009 WL 840395, at *1 (E.D. Cal.

15   March 30, 2009) (holding that the Board's one month delay in holding a prisoner's parole

16   hearing did not violate the Due Process Clause based upon the same grounds).

17          VII.    STATE COURT DECISION

18          Petitioner's habeas petitions filed in the California Court of Appeal and California

19   Supreme Court contained the same claims as his San Mateo County Superior Court petition,

20   and both appellate petitions were summarily denied.  (*See* Dkt. 1, Exs. I, K, and L.)  The

21   parties agree that petitioner has properly exhausted his state court remedies, and timely filed

22   the instant petition.  (*See* Dkt. 1 at 2-5; Dkt. 6 at 4.)  This Court reviews the San Mateo

     County Superior Court's Order upholding the Board's decision to determine whether it meets

01  the deferential AEDPA standards, as it is the last reasoned state court decision.  *See Ylst*, 501

02  U.S. at 803-04.

03        In a reasoned decision denying petitioner's request for habeas relief, the San Mateo

04  County Superior Court asserted that based upon its review of the record, the Board's decision

05  was supported by "some evidence."  (*See* Dkt. 1, Ex. I at 2-3.)  The superior court reviewed

06  the facts of the commitment offense, and the record of the parole hearings.  (*See id*. at 3.)

07  Specifically, the superior court noted that the Board "considered the relevant factors under

08  Title 15 of the California Code of Regulations §§ 2401 and 2402 relating to parole

09  suitability," and properly denied petitioner a parole release date based upon those factors.

10  (*Id*.)  The superior court also concluded that the postponement of petitioner's parole hearing

11  for six months did not merit habeas relief.  (*See id*. at 3.)  Because the decisions of both the

12  state court and the Board were supported by "some evidence," there is no need to reach

13  respondent's argument that another standard applies.

14        VIII.   CONCLUSION

15        Given the totality of the Board's findings, there is "some evidence" that petitioner's

16  release as of the date of the Board's decision, December 5, 2005, would have posed an

17  unreasonable risk to public safety.  The San Mateo County Superior Court's Order upholding

18  the Board's decision was therefore not contrary to, or an unreasonable application of, clearly

19  established federal law, or based on an unreasonable determination of facts.  Accordingly, I

20  recommend the Court find that petitioner's federal due process rights were not violated and

21  that the petition be denied, and this action be dismissed with prejudice.

22        This Report and Recommendation is submitted to the United States District Judge

    assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty days

REPORT AND RECOMMENDATION - 20

01  after being served with this Report and Recommendation, any party may file written

02  objections with this Court and serve a copy on all parties.  Such a document should be

03  captioned "Objections to Magistrate Judge's Report and Recommendation."  Failure to file

04  objections within the specified time may waive the right to appeal the District Court's Order.

05  *See Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).  A proposed order accompanies this

06  Report and Recommendation.

07          DATED this 10th day of June, 2009.

08

09

10                                        JOHN L. WEINBERG
                                          United States Magistrate Judge

11

12

13

14

15

16

17

18

19

20

21

22

REPORT AND RECOMMENDATION - 21